# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

### * * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 2:11-cr-00165-RLH-GWF |
| Plaintiff, | ) | **O R D E R** |
| vs. | ) | (Motion to Dismiss Indictment– #208) |
| BRENT EDWARD LOVETT, | ) | |
| Defendant. | ) | |

Before the Court is Defendant Brent Edward Lovett's **Motion for a Dismissal of the Indictment, and a Judgment of Acquittal, or for a New Trial Under Federal Rules of Criminal Procedure 29 and 33** (#208, filed on March 13, 2013).  The Court has also considered Plaintiff United States' ("Government") Opposition (#209, filed March 13, 2013 ), and Defendant's Reply (#210, filed March 18, 2013). For the reasons discussed below, the Court denies Defendant's motion.

## BACKGROUND

This is a criminal case for one count of bank fraud against Defendant Brent Edward Lovett ("Defendant") . On April 27, 2011, the Grand Jury returned a one count indictment against Defendant for bank fraud arising from Defendant's application of a commercial real estate loan

AO 72
(Rev. 8/82)

1    with Lockheed Federal Credit Union ("Lockheed"). The indictment charged that Defendant

2    falsified records and documents to induce Lockheed into lending Defendant's company

3    $7,500,000.00. (#1). Defendant entered a plea of not guilty and was appointed a federal public

4    defender. (#9). Thereafter, Defendant was appointed a CJA attorney, Krystallin Hernandez with

5    the Offices of Robert Langford. (#12).

6    **Appointment of New Counsel**

7          Almost immediately, Defendant began having issues with Hernandez because

8    Hernandez was not making certain discovery requests or filing motions. (#19, #37, #42, #56)

9    Defendant sought to replace Hernandez. This Court held a hearing on the matter and denied the

10   motion on the basis that Defendant's objections to Hernandez's representation were decisions left

11   solely to the discretion of the attorney. Defendant continued to ask for new counsel and moved to

12   proceed *pro se*. (#103). Again, this Court held a hearing, and relieved Hernandez of her

13   representation. On September 7, 2012, after strongly cautioning and advising Defendant against

14   self-representation, the Court canvassed Defendant pursuant to *Faretta* and allowed him to

15   proceed *pro se*. (#119).

16         Within hours of that decision, Defendant filed three motions, (#107, 108, 109) for

17   production of *Brady* materials, to modify pre-trial conditions of supervision, and to dismiss the

18   indictment, and three days later, again filed four more motions to unseal personal information of

19   Tim Molyneux, to conducted voir dire, for alternating peremptory challenges, and to continue trial.

20   (#110, 111, 112, 113). On September 14, 2012, this Court found Defendant engaged in

21   obstructionist misconduct, violated rules of law, and violated the Court's orders. The Court cited

22   Defendant's numerous motions to continue trial, the motions Defendant filed on September 7, and

23   Defendant's requests for trial subpoenas to obtain credit card statements and tax returns that the

24   Court previously found to be irrelevant. The Court found all of this conduct was for the purposes

25   of obstruction, delay, and attempting to interject improper things in violations of rules, and were

26   only to disrupt the proceedings. The Court terminated Defendant's self-representation and re-

2

1   appointed Hernandez. Then, on the eve of trial, Defendant filed multiple bar complaints against

2   Hernandez and Langford. (#141). This Court again relieved Hernandez and Langford of their

3   representation and appointed new CJA counsel, Gabriel Grasso. Mr. Grasso was subsequently

4   relieved of his representation because of a professional responsibility conflict with the US

5   Attorney's Office. Mr. Thomas Ericsson was appointed as new counsel.

6   **Discovery Disputes**

7          Many of Defendant's discovery disputes with his counsel arose from counsel's

8   alleged failure to request certain documentation and subpoenas. Based on these disputes, the

9   subpoenas were issued and the trial was delayed seven times. Defendant's trial was originally set

10  for August 8, 2011 and this Court granted 7 continuances until the trial ultimately commenced on

11  February 19, 2013.

12  **Jury Questionnaires**

13         After calendar call, Defendant requested to personally review the jury

14  questionnaires. As the customary practice is to only allow counsel to review the questionnaires and

15  not an individual defendant, the Court declined the request. To the Court's knowledge, Mr.

16  Ericsson and the Government both reviewed the questionnaires. Both parties were then given the

17  opportunity to submit proposed questions for the voir dire and both parties accordingly did so.

18  Defendant's submissions largely mirrored the Court's standard voir dire questions.

19  **Jury Selection**

20         On February 19, 2011, moments before jury selection began, Defendant again

21  moved to proceed *pro se*. Defendant argued that he had a much better grasp of the documents

22  involved in the case than Mr. Ericsson. The Court canvassed Defendant pursuant to *Faretta* and

23  granted Defendant's motion directing Mr. Ericsson to continue as standby counsel. Moments later,

24  prospective jurors entered the room and jury selection began. The Court itself conducted the jury

25  questioning, as is its standard procedure. Once the Court concluded its questioning, it called both

26  the Government and Defendant to side bar to inquire whether either side had follow-up questions.

AO 72
(Rev. 8/82)

Both sides had additional questions which the Court then asked and prospective jurors answered. Both sides exercised their peremptory strikes and a jury of twelve plus four alternates were impaneled.

**Trial**

On February 20, 2013, the Government began its case-in-chief, calling 13 of its 17 witnesses over four days. Defendant did not move for a directed verdict at the end of the Government's case. Defendant called 4 witnesses of his 28 listed witnesses over the course of two days. Defendant did not testify. On February 27, 2013, the jury returned a verdict of guilty.

Once the jury was excused, Mr. Ericsson inquired as to his status as stand-by counsel. This Court asked Defendant if he wanted Mr. Ericsson appointed as counsel for sentencing, to which Defendant responded yes. The Court re-appointed Mr. Ericsson as counsel for the Defendant. On March 13, 2013, Defendant filed the instant motion *pro se*.

## DISCUSSION

Defendant moves this Court to dismiss the indictment, adjudge him acquitted, or grant him a new trial. The Government objects on the basis that Defendant submitted the motion *pro se* while represented by counsel and seeks to strike the motion.[1] Defendant replies that "[a]t no point did the Defendant believe he was giving up his right to continue in Pro Se status." (Reply, #210 at 2). Defendant asks this Court to consider the motion on its merits.

### I. Defendant's *Pro Se* status

A defendant in a federal criminal case has a statutory and constitutional right to self-representation. *See* 28 U.S.C. § 1654; *Faretta v. California*, 422 U.S. 806, 834–36 (1975). A defendant who chooses to represent himself is entitled to do so if he is "aware of the dangers and disadvantages of self-representation," and makes this choice "knowingly and intelligently." *Id.* at

---

[1] The Court also notes that Defendant's motion exceeds the page limited allowed by the Local Rules. Local Rule of Criminal Practice limits motions to 30-pages unless prior authorization is sought and obtained from the Court to exceed that limit. Defendant has not sought or obtained the permission of this Court to exceed that page limit.

AO 72
(Rev. 8/82)

835.  (internal quotation marks omitted). As Defendant represented himself at trial, the issue is not whether he was "aware of the dangers and disadvantages of self-representation," or whether his election to represent himself was "knowing[ ] and intelligent[ ]." Rather, the issue is whether Defendant relinquished his *pro se* status when this Court asked him if he wanted counsel for the sentencing portion of the case and he responded in the affirmative.

Determining what a defendant has elected to do regarding representation is a recurring dilemma for the courts. If a court incorrectly determines that the defendant has elected self-representation, it has deprived him of the constitutional right to be represented by counsel. But if it incorrectly determines that the defendant has not elected self-representation, it has likewise deprived him of a constitutional right. Thus, "if a defendant in a criminal proceeding makes an *equivocal* demand on the question of self-representation, he has a potential ground for appellate reversal no matter how the district court rules." *United States v. Treff*, 924 F.2d 975, 979 (10th Cir. 1991). To ameliorate this problem, and because a waiver of the right to counsel should not be lightly inferred, the Ninth Circuit has held that defendant's election to represent himself must be *clearly* and *unequivocally* asserted. *United States v. Bishop*, 291 F.3d 1100, 1114 (9th Cir. 2002)(holding that the assertion must be voluntary and intelligent, timely, not for the purpose of delay, and unequivocal).

Defendant asserts that he was under the impression that he would continue to represent himself during the sentencing portion of the case. However, this Court and the Government understood Defendant's representations at the end of trial to be that he wanted counsel and that Mr. Ericsson, who acted as stand-by counsel, would be re-appointed as Defendant's attorney.  To be sure, at the end of trial Mr. Ericsson asked as to his status as standby counsel. The Court then questioned Defendant.

> **THE COURT**: I have a question of Mr. Lovett and that is, you have represented yourself during trial. I will give you the opportunity to request counsel for the purpose of sentencing.

AO 72
(Rev. 8/82)

**PRO SE LOVETT**: I would accept that, sir.

**THE COURT**: All right. Mr. Ericsson, are you willing to accept the appointment to represent him through the sentencing process?

**MR. ERICSSON**: Yes, Your Honor.

**THE COURT**: All right. That will be the order.

It is clear to the Court, as well as the Government and presumably Mr. Ericsson, that Defendant did not unequivocally make clear that he wanted to continue to represent himself after the trial. In fact, just the opposite is true; Defendant requested counsel for the purposes of sentencing and this Court re-appointed Mr. Ericsson to represent the Defendant through the sentencing process. Thus, at the time of the filing of this motion, Defendant was, and still is, represented by counsel.

Thus, denial is warranted on procedural grounds because Defendant filed this motion *pro se* while represented by counsel and because the motion exceeded the maximum page limit without requesting or obtaining permission to do so.

However, Defendant has, in his reply, requested the Court to permit him to proceed *pro se* so it would consider his motion. The Court will grant his request to the extent that it will consider his motion on the merits, but will not otherwise grant his request to represent himself through sentencing. In other words, the Court holds that Mr. Ericsson is still Defendant's counsel through sentencing, absent a specific motion by Defendant to represent himself through sentencing.

Accordingly, the Court will now consider the motion on its merits.

**II. Defendant's Motion**

Federal Rule of Criminal Procedure 29 allows a defendant to "move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). Additionally, Federal Rule of Criminal Procedure 33 allows the defendant to move the court to "vacate any judgment and grant a

AO 72
(Rev. 8/82)

new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). If not based on newly discovered evidence, such a motion "must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2). Here, the jury verdict was entered on February 27, 2013 and Defendant filed the instant motion on March 13, 2013, exactly 14 days later. Thus, Defendant's motion is timely filed.

As to the substance of the 59-page motion, Defendant spends only 6 pages on his arguments. The remainder of the motion contains a litany of Defendant's grievances with this Court's rulings and displeasure with the way the Government presented its case. The Court addresses each in turn.

### A. Motions for a New Court Appointed Attorney

Defendant relates his multiple disagreements with appointed counsel and his multiple motions to replace counsel. The Court is well aware of the disagreements Defendant has had with his appointed counsel, as well as the multiple bar complaints Defendant filed against them on the eve of trial. Defendant's complaints related to his counsel's decisions regarding trial strategy, motion practice, and discovery practice. The Court explained that while Defendant could make suggestions, these decisions were firmly within the decision making power of the attorney and that the Defendant did not have the right to make those decisions. Despite this, Defendant was insistent on being appointed a new attorney, which this Court did four times. This Court granted numerous extensions of time based on Defendant's complaints that he had "been asking from the beginning for subpoenas and motions for discovery." This Court allowed the motions, included the witnesses, and issued the subpoenas; moreover, when the first batch of subpoenas were not served because of an issue with the U.S. Marshal's Office, this Court again continued trial and the subpoenas were delivered and served to the extent that there were legitimate addresses. Defendant

AO 72
(Rev. 8/82)

1      was given numerous

2   continuances to prepare witnesses and examine documents.[2] Ultimately, Defendant represented

3   himself at trial and in fact, Defendant had a longer witness list than the Government. Defendant's

4   objections to prior appointed counsel's alleged failures to ascertain pertinent information during

5   discovery ring hollow when Defendant failed to call all but a few of his witnesses and introduced

6   few, if any, documents in his defense. Even if Defendant had issues with his prior counsel, those

7   inadequacies are irrelevant and have been fully mitigated by the numerous appointments of new

8   counsel, continuances, and allowance of the discovery Defendant requested.

9   **B. Government Misconduct Before the Grand Jury**

10      Defendant alleges that FBI Special Agent Neal Umphress, the sole grand jury

11   witness, gave "patently false and misleading" testimony, which led to the "erroneous indictment"

12   of the Defendant. Defendant bases this conclusion on the fact the testimony given by Agent

13   Umphress at the grand jury and at trial differ. Defendant also takes issue with the Government not

14   calling Tim Molyneux as a trial witness because Mr. Molyneux's later recanted statements were

15   relayed to the Grand Jury by Agent Umphress. Defendant notes that the allegedly "false statements

16   [ ] make up over 20% of all the questions asked during the Grand Jury."

17      "As a general matter, a district court may not dismiss an indictment for errors in

18   grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. U.S.*,

19   487 U.S. 250, 254 (1988). "Under this standard, dismissal of the indictment is appropriate only 'if

20   it is established that the violation substantially influenced the grand jury's decision to indict,' or if

21   there is 'grave doubt' that the decision to indict was free from the substantial influence of such

22   violations." *Id.* at 256.

23

24

25      [2] To be sure, Defendant's trial was set for August 8, 2011 and this Court granted 7

26   continuances to November 14, 2011, March 12, 2012, June 4, 2012, August 27, 2012, September 18, 2012, December 3, 2012, and February 19, 2013.

AO 72
(Rev. 8/82)

Despite Defendant's numerous references to alleged discrepancies between the grand jury and trial testimony of Agent Umphress, the Court cannot conclude that any violation substantially influenced the grand jury's decision to indict. First, there is no basis for or a requirement that this Court compare and evaluate the evidence presented at the Grand Jury and the evidence presented at trial. Second, the Court notes that while Defendant identifies some discrepancies, he does not allege how those discrepancies are material or how that testimony was prejudicial. Moreover, the Court's review shows that the differences in the testimony are tangential and immaterial. It is of no consequence to the grand jury proceedings or the resulting indictment whether the building was bought in 2004 or 2006, whether there were 4 or 17 payments on the loan, whether the building went into foreclosure in 2007 or 2009, or whether Defendant benefitted to the tune of $1.3 million or $10,000.00. Neither is it of any consequence that Tim Molyneux was not called as a witness at trial. Last, even taking Defendant's argument at face value, Defendant admits only 20% of the questions elicited answers that were "false." Therefore, the Grand Jury could have reasonably determined to indict the Defendant on the remaining 80% of material truthful answers of Agent Umphress.

This Court is not convinced that there were any material errors in the Grand Jury proceedings. However, even if there were errors, Defendant was not prejudiced, those errors did not substantially influence the grand jury's decision to indict, and there is little to no doubt that the decision to indict was free from the substantial influence of the errors. Further, any claim that the FBI misled the Grand Jury is not grounds for attacking the trial, the evidence produced at trial, or the decision of the jury. Thus, Defendant's argument fails and the Court will not dismiss the indictment on this basis.

### C. Motion to Compel Timely Production of Documents

Defendant argues that certain documents were not produced by the Government during the normal course of discovery. This is simply a second attempt to argue an already denied motion and this Court has already found the challenge to be meritless. (#129).

1          Under *Brady*, "suppression by the prosecution of evidence favorable to an accused

2   *upon request* violates due process *where the evidence is material either to guilt or to punishment,*

3   irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87

4   (1963)(emphasis added). Defendant argues that Agent Umphress testified certain items existed, i.e.

5   phone messages, interview of Thomas Wideen, original complaint from Lockheed Federal Credit

6   Union, agent's notes, original complaint from Thomas Bogel, and information sent and received

7   from Attorney Balinas, that were not produced by the Government. However, any of these

8   documents, or Agent Umphress' reliance on them, is relevant only to why an investigation was

9   opened and is immaterial to Defendant's guilt for the accused crime of bank fraud. Accordingly,

10  this Court sustained the Government's objection when Defendant sought to raise this argument at

11  trial.

12          Additionally, all the other documents Defendant alleges were not produced, i.e.

13  arrest reports, notes, dispatch and other tapes, anything with Defendant's statements, other

14  discoverable material, tests and examinations conducted upon the evidence, videotapes, or other

15  physical documents, either do not exist or were produced.  Defendant relies on an answer by Agent

16  Umphress in response to Defendant's question that Agent Umphress conducted some form of a

17  test or made a spreadsheet as to the flow of funds into and out of one of the accounts, and that he

18  made some notes, which were placed into a file. Agent Umphress testified that while he made the

19  notes, he did not know where they were today. To the extent that the Government had the files, the

20  Government has produced the same. However, as represented by the Government based on

21  Defendant's earlier motion, the things Defendant requests are not in the possession of the

22  Government and the Government cannot produce what it does not have. Therefore, the Court again

23  finds that this challenge is meritless and there were no non-disclosures that warrant a reversal of

24  the jury verdict.

25                              **D. Motion for the Issuance of Subpoenas**

26

Defendant argues that this Court erred in not issuing subpoenas for Paul Walton and American Express. Defendant suggests that financial files of Castle Creek Resort, tax returns, and credit card statements would prove the location of where the Defendant was when the 24 emails were sent and that some emails were sent when Defendant was on an airplane. Defendant's argument is completely non-sensical. The Court cannot comprehend how a tax return would show where the Defendant was on any particular day. Moreover, as an email can be sent from anywhere in the world, where Defendant was on any particular day is irrelevant. Last, how a credit card statement or tax return would show that Defendant was on an airplane at a particular time is also beyond comprehension. Last, and perhaps most importantly, the documents Defendant requests are his own and those of his company. Not only should the documents already be in his possession, but if they are not, Defendant does not need a subpoena to obtain that documentation. As to documents of Paul Walton, Defendant did not identify how the request of Mr. Walton's personal records are probative, relevant, or not a fishing expedition. The arguments make no sense and do not support Defendant's motion.

**E. Motion to Introduce Business Records**

Defendant argues that his prior counsel "was required to fight against the admission of any electronic document." Defendant spends several pages giving a dissertation on hearsay and authentication arguing that the emails, admitted as a business record, were hearsay and also were not authenticated. Defendant also argues that he "should have had an (sic) forensic cyberspace expert as requested by the Defendant time and time again."

The Court reiterates its prior explanations that Defense counsel, i.e the attorney, *not the Defendant* makes discovery and trial practice decisions. Defense counsel was not "required" to make a frivolous argument to fight the admission of the electronic documents. Moreover, the emails were kept in the regular course of Lockheed business and fit squarely within the business record exception to the hearsay rule. Also, contrary to Defendant's argument, the documents were

AO 72
(Rev. 8/82)

1    authenticated by the custodian of records at Lockheed. Thus, it is wholly unclear what objection

2    Defendant wanted his prior counsel to raise.

3             Defendant argued to the jury, through his multiple improper lines of questioning

4    and during closing, that it could not be definitively shown who sent the emails. To this end,

5    Defendant asked Mr. Kostman questions regarding Bay Resorts email server to establish that the

6    company email accounts were not set up to allow remote access and consequently, that emails sent

7    during the time Defendant was in California could not have been sent by the Defendant. Despite

8    the fact that Defendant did not designate Mr. Kostman as an expert, the Court permitted this

9    questioning. However, Mr. Kostman testified that he had not ever seen the server or worked with

10   the server about which Defendant wanted him to testify. Thus, the witness Defendant chose to use

11   as an expert, to argue his theory of the case, did not have any personal knowledge of the actual

12   server. The jury heard Defendant's arguments, weighed the evidence, decided what to believe and

13   what weight to give to the testimony, and reasonably concluded that Defendant was guilty. Thus,

14   this Court finds no reason to disrupt the jury's verdict.

15                            **F. Request for Prior Hearing Transcripts**

16            Defendant argues this Court erred in not authorizing the payment of public funds

17   for hearing transcripts to "prepar[e] for trial, review of the motions and arguments made and to

18   understand the legal process." First, the Court notes that the dates Defendant specifies for the

19   hearing requests were largely when Defendant was seeking new counsel. The only other pertinent

20   information was discovery motion rulings and calendar call. The hearing transcripts would not be

21   needed to prepare, review, or understand the case. One would only need to review the motions,

22   objections, responses, and this Court's orders on the same. Thus, pursuant to the Criminal Justice

23   Act of 1964, the transcripts were not "necessary to the proper presentation of the indigent

24   defendant's case." There was no error and this is not a basis upon which to disrupt the jury's

25   verdict.

26                            **G. Request to Perform Voir Dire**

AO 72
(Rev. 8/82)

Perhaps the most perplexing argument made in Defendant's motion is Defendant's objection to this Court's voir dire of prospective jurors. Defendant argues that this Court should have allowed him to conduct the voir dire himself. Also, Defendant argues that this Court erred in its questioning of prospective jurors because this Court "failed to ask any question to [ ] the jury pool if they would judge the Defendant differently if he was a homosexual."

First, Defendant does not have the right to conduct the jury questioning himself. Pursuant to Federal Rule of Criminal Procedure 24, "The court may examine prospective jurors *or may* permit the attorneys for the parties to do so." Fed. R. Crim. P. 24 (emphasis added). The rule further provides that "If the court examines the jurors, it must permit the attorneys for the parties to" "ask further questions that the court considers proper" or "*submit further questions* that the court may ask if it considers them proper." The Court's practice is to conduct the questioning itself. In light of Rule 24, this Court explained its standard procedures to the Defendant. (#129). Defendant was permitted an opportunity to submit questions to the Court to be read to the Jury. To be sure, Defendant, through his prior counsel, submitted questions that largely overlapped with the standard questions asked by this Court. (#78, #180). Following the Court's voir dire, the Court further inquired of Defendant if there were additional questions Defendant wanted answered. Defendant and the Government both submitted additional questions that were subsequently asked and answered. Then, this Court also allowed alternating peremptory challenges, as is its standard procedure. The fact that the Court did not allow the Defendant to conduct the questioning himself was not improper and did not prejudice Defendant in any way.

Second, Defendant's objection completely ignores that fact that this Court did not know of Defendant's sexual preferences or relationships prior to trial and had no way of knowing that it should voir dire on that issue. The Court itself was unaware of Defendant's sexual orientation until it was elicited from Defendant's witness. Defendant did not raise any concerns about potential juror bias, before or during trial, and did not object to Prosecution's questions which elicited testimony regarding Defendant's sexuality. These concerns should have been

1   readily foreseeable as Defendant, as part of his defense, called his former partner to the stand.  If

2   Defendant was concerned about bias within the jury, it was his responsibility to raise the issue.

3   Defendant's expectation that this Court be clairvoyant is misplaced.

4   Further, even had the Court known Defendant's sexual orientation, despite having

5   ample opportunity to do so, Defendant never requested the jury be questioned about their attitudes

6   regarding homosexuality. Defendant was free to propose voir dire questions to the Court to read to

7   the entire jury pool.  Later, Defendant had the opportunity, following the initial questioning, to

8   request the Court question the remaining jurors or follow-up with individual jurors. Never during

9   this entire process did Defendant request the jurors be questioned about their attitudes regarding

10  homosexuality. Defendant can not assert the Court erred in failing to ask questions when he never

11  requested those questions to be asked.

12  Finally, despite Defendant's assertion that the *Government* made Defendant's

13  homosexuality an issue, the Court notes that the Government's case-in-chief contained no

14  references to Defendant's sexuality.  Defendant's sexual orientation only became relevant because

15  *Defendant* chose to put Mr. Robert Lee, Defendant's former partner, and Mr. Lee's mother on as

16  witnesses. The Government has the right to cross-examine witnesses on the issue of credibility and

17  potential bias. The Government was entitled to impeach both Mr. Lee and his mother as to their

18  credibility and their bias toward Defendant. In fact, both Mr. Lee and his mother asked this Court

19  whether they could remain in the courtroom after their testimony, and both were in the gallery

20  during the closing arguments and the reading of the verdict. Thus, it was Defendant who placed his

21  sexuality at issue.  The jury was entitled to decide what and who to believe and what weight to

22  give to the testimony.

23  **H. Request to Review Jury Questionnaires**

24  Defendant takes issue with this Court's holding that Defendant could not personally

25  review jury questionnaires. Defendant argues that it "became clear that the Government had an

26  upper hand by knowing content and detail of the jury questionnaires, which Defendant had no

knowledge of." Initially, the Court notes that at the time of the request, Defendant was represented by counsel. Defendant's decision to proceed *pro se* took place only minutes before jury selection began. Defendant does not have a right to personally review the questionnaires when represented by counsel. Moreover, even though Defendant had not personally reviewed the questionnaires, Mr. Ericsson, who was acting as stand-by counsel, had reviewed the questionnaires. Defendant could have asked Mr. Ericsson any questions he may have had about the content and detail of the jury questionnaires and for that reason there was no "upper hand." Additionally, the Court notes that the "upper hand" to which Defendant refers, led only to a single question by the Government.[3] The Government made no challenges for cause. The inability to personally review the questionnaires, especially because stand-by counsel had reviewed the same, did not prejudice the Defendant and does not support granting of the motion.

## I. Trial

### 1. Admission of Business Records

Defendant objects to the admission of business records into evidence. Not only are these documents admissible, as exceptions to the hearsay rule, as business records kept in the ordinary course of business, but Defendant did not object to their admission at trial. Thus, the argument fails.

### 2. Request for Daily Transcripts

Defendant objects to this Court's order denying daily transcripts of the trial. The Court has already elucidated on the record all the reasons why the request is burdensome and untimely. Not only would it pose an extreme hardship on the court reporter, but the requests were required to have been made weeks prior to accommodate the request. Also, the Court corrects Defendant's characterization of the situation. First, the Government did not have "a very large staff present in the courtroom throughout trial." The Government consisted of Ms. Griswold, lead

---

[3] That question ultimately revealed a potential juror's suicidal tendencies and subsequently resulted in the potential juror's dismissal.

AO 72
(Rev. 8/82)

counsel, Mr. Pugh, secondary counsel, and Agent Umphress, the case agent. Any other staff were coordinating witnesses for the Government and were not consistently present in the gallery. Thus, what "very large staff" Defendant refers to is unknown to the Court. Second, while Defendant represented himself, this Court granted Defendant extensive liberties in his questioning and time management, including allowing the Defendant to take, at times, 5 full minutes between questions and answers during his direct and cross examination of witnesses. Therefore, any argument that Defendant was forced to "write down each question and answer, then run to the podium and ask questions, write them down, and the answer *without delaying the trial in any way*" is disingenuous. (Court's emphasis). Any inconvenience was mitigated by this Court's liberal grant of time to the Defendant for his questioning.

### 3. Exclusion of Witness

Defendant argues this Court erred in not allowing Mr. Kostman to testify as an expert. Defendant admits his "entire case is based upon the showing that it would be impossible for any email to be sent in 2006, from the Bay Resorts account due to the set up on the server, the software in use, and the firewall system in place at that time in 2006." As already discussed above, the most significant reason this argument fails is that despite the fact that Defendant did not designate Mr. Kostman as an expert, the Court still permitted Defendant to ask Mr. Kostman questions regarding the server to question the origination of the emails. But, fatal to Defendant's argument is that Mr. Kostman testified that he had not ever seen the server or worked with the server about which Defendant wanted him to testify. Thus, the witness Defendant chose to use as an expert to argue his theory of the case did not have any personal knowledge of the server and could not verify the "facts" Defendant hopes to argue now. The jury heard Defendant's arguments, weighed the evidence, decided what to believe and what weight to give to the testimony, and concluded that Defendant was guilty. The Court finds no reason to disrupt the jury's verdict.

### J. Government's Presentation of the Case

AO 72
(Rev. 8/82)

1        Defendant's arguments against the way the Government presented its case, what

2    evidence and witnesses the Government chose to use, and why Defendant was not allowed to

3    argue about the lender's negligence are all faulty. Defendant argues many facts that were not

4    presented at trial. Even so, his claim, that the Government failed to prove that he authored or

5    caused the emails to be sent, ignores the plethora of circumstantial evidence, which was

6    legitimately introduced and from which reasonable inferences could be drawn. Defendant does not

7    deny any of the things he claims the Government failed to prove, but rather just argues that it was

8    not proven. Moreover, the question of who wrote the emails is one of fact and consequently a

9    determination to be made by the jury.  The jury concluded that the Government did prove its case

10    and the Court finds no reason to disrupt that conclusion.

11        Additionally, Defendant had the opportunity to present evidence, and did so.

12    Defendant had the opportunity to make his arguments to the jury, and most of those arguments he

13    now makes he also made to the jury. Defendant apparently was not listening to the overwhelming

14    amount of evidence the Government presented. There is no evidence that the jury was anything but

15    rational. Again, the jury heard the evidence, decided what to believe, decided what weight to give

16    each witness' testimony and concluded the Defendant was guilty. There was certainly sufficient

17    evidence upon which they could base their verdict and this Court will not disrupt that verdict.

18        **K. Corporations and Piercing the Corporate Veil**

19        Defendant argues that the Government spent too much time showing "who was in

20    charge, who owed you the money, who, who, who..." to get witnesses to identify the Defendant

21    when "everything was done under a standard corporate umbrella, with the full protection allowed

22    by law extended to the corporation." Defendant insinuates that this Court impermissibly allowed

23    the Government to "reach beyond the wall of protection that divides a corporation from the people

24    or entities that exist behind it." However, Defendant incorrectly applies a *civil* liability limitation

25    to a *criminal* case. It is true that the corporate veil protects individual shareholders from personal

26

AO 72
(Rev. 8/82)

*civil* liability; however, here Defendant was charged with bank fraud, a crime for which he cannot assert the doctrine. Thus, this argument is meritless.

Defendant has not convinced this Court dismissal of the indictment, judgment of acquittal, or a new trial is warranted. Thus, the Court denies the motion.

**CONCLUSION**

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Defendant' Motion for a Dismissal of the Indictment, and a Judgment of Acquittal, or for a New Trial (#208) is DENIED.

Dated: April 4, 2013.

_____
**ROGER L. HUNT**
**United States District Judge**

AO 72
(Rev. 8/82)